PHILLIP A. TALBERT
United States Attorney
NIRAV K. DESAI
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>    v.<br><br>SATISH KARTAN, and<br>SHARMISTHA BARAI,<br><br>       Defendants. | CASE NO.  2:16-CR-0217 MCE<br><br>OPPOSITION TO DEFENDANT SATISH KARTAN'S MOTIONS TO SUPPRESS EVIDENCE AND TO DISMISS INDICTMENT<br><br>DATE: November 2, 2017<br>TIME: 10:00 a.m.<br>COURT: Hon. Morrison C. England, Jr. |

The United States of America ("government") hereby opposes defendant Satish Kartan's ("Kartan") untimely and unsupported motions to suppress evidence seized during execution of a search warrant (Dkt. 55) and to dismiss the indictment for purported misconduct by a case agent (Dkt. 56).

## I.   KARTAN'S MOTIONS ARE UNTIMELY.

The Court may deny Kartan's motions because they were untimely filed.  This Court set a Rule 12 motions cutoff that was continued twice to an ultimate deadline of September 28, 2017.  Kartan filed his motions on October 10, 2017, without showing any cause for the late filings.

Federal Rule of Criminal Procedure 12(c)(1) permits the district court to "set a deadline for the parties to make pretrial motions."  See also L.R. 430.1(b) (Apr. 1, 2017) ("All pretrial motions shall be filed within twenty-one (21) days after arraignment unless a different time is specifically prescribed by the Court.").  Rule 12 further provides that "[i]f a party does not meet the deadline for making a Rule 12(b)(3), the motion is untimely," but "the court may consider the defense, objection, or request if the

party shows good cause." Fed. R. Crim. P. 12(c)(3). This Court's Local Rules require a party unable to comply with the deadline to promptly move for an extension of time:

> **Extensions of Time.** If a party is unable to comply with the foregoing schedule for the filing of motions, that party shall move the assigned Magistrate Judge for an extension of time specifically setting forth the basis for the requested extension. See L.R. 144. Such motion shall be made as soon as practicable but, in any event, not later than the last date set by the Court for the filing of motions.

L.R. 430.1(f). The Ninth Circuit Court of Appeals has held that a district court properly exercises its discretion by denying untimely motions to suppress and dismiss. See, e.g., United States v. Swihart, 192 F. App'x 644, 645 (9th Cir. 2006) (unpub.) ("[T]he district court did not abuse its discretion by refusing to consider . . . motion to suppress because the motion was untimely and [defendant] offered no justification for the untimeliness.); United States v. Zidar, 178 F. App'x 673, 676 (9th Cir. 2006) (affirming denial of untimely motions to suppress and dismiss as proper exercise of district court's discretion, and declining to review motions on merits); United States v. Torres, 908 F.2d 1417, 1424 (9th Cir. 1990) ("An unjustified failure to make a timely motion to suppress pursuant to Rule 41(f) and Rule 12 constitutes a waiver of that right."); United States v. Davis, 663 F.2d 824, 831 (9th Cir. 1981) (affirming denial of motion to suppress as untimely filed).

The pending indictment was returned on November 17, 2016 (Dkt. 25). On May 17, 2017, the parties requested, and the Court ordered, that trial begin March 26, 2018, and that the defendants file pretrial motions no later than July 27, 2017. (Order, May 17, 2017, at 3-4, Dkt. 41.) The parties' stipulation noted the defendants had expressed a desire to file pretrial motions. (Id. at 2.) On the parties' stipulation, the Court continued the filing deadline twice, ultimately to September 28, 2017, with oppositions due on October 19, 2017. (Order, Sep. 15, 2017, Dkt. 54; Order, July 27, 2017, Dkt. 50.)

Despite the fact that Kartan knew he wanted to file pretrial motions as of May 2017, and a continuance of the filing deadline by two months, from July 27th to September 28th, Kartan missed the Court-ordered deadline. He ultimately filed the pending motions after 8:50 p.m. on October 10, 2017, missing the deadline by 12 days, in derogation of a Court order, and prejudicing the government by effectively shrinking its response time to seven court days.

Moreover, despite the requirement of Local Rule 430.1(f), Kartan did not request an extension

from the Court or the other parties, and has shown no cause—let alone good cause—for filing well-past the Court-ordered deadline.  His motions provide no explanation or justification for the late filings.  And on September 27, 2017, Kartan's counsel emailed counsel for defendant Barai and the government "just to let everyone know" that Kartan's motions would be filed late, unilaterally indicating a new deadline of October 1st or October 2nd; the email neither sought a mutually agreeable extension nor provided an explanation for the anticipated late filings.  (Exhibit 1.)  Kartan then missed his own unilaterally extended deadline by eight days.  Kartan's motions are unjustifiably late, and the Court may deny them on that basis.  Should the Court consider the motions, the government responds on the merits.

## II.   KARTAN'S MOTION TO SUPPRESS IS FACTUALLY INCORRECT AND UNSUPPORTED, AND SUPPRESSION IS NOT A PROPER REMEDY.

The indictment charges both defendants with conspiracy to commit forced labor in violation of 18 U.S.C. § 1594(b), and two counts of forced labor in violation of 18 U.S.C. § 1589(a); it further charges Kartan with fraud in foreign labor contracting in violation of 18 U.S.C. § 1351(a), and Barai with benefitting from forced labor in violation of 18 U.S.C. § 1589(b).  In short, the indictment charges them with recruiting workers from overseas and within the United States to work in their home under their control, coercion, and grueling work conditions.  As part of the investigation, Homeland Security Investigations ("HSI") Special Agent ("SA") Marc Beeson obtained a search warrant to search the defendants' residence (No. 2:16-sw-0543 KJN (E.D. Cal.)).  (Exhibit 2.)  The warrant permitted execution "in the daytime 6:00 a.m. to 10:00 p.m."  (Id. at 1.)

On September 9, 2016, law enforcement agents executed the search warrant, and the sworn search warrant return reflects that the warrant was executed on that date at 7:00 a.m.  (Exhibit 2 at 2; Dkt. 5, No. 2:16-sw-0543 KJN (E.D. Cal.).)  A Report of Investigation is in accord, reflecting that agents met for a briefing at 5:00 a.m. at HSI's Stockton office, and that an agent first knocked on the front door of the premises at approximately 6:30 a.m.  (Exhibit 3 at 2.)

On these facts, alone, the Court should deny Kartan's motion to suppress because the search warrant was executed after 6:00 a.m.  In the face of a search warrant return and a Report of Investigation showing execution of the warrant after 6:00 a.m., Kartan offers only the unsworn, unsupported, and vague allegation of his counsel contained in one sentence in his brief:  "Here, despite the express

OPP'N TO MOT. TO SUPPRESS & MOT. TO DISMISS,
UNITED STATES v. KARTAN, 2:16-CR-0217 MCE

dictates of the warrant command for a daytime only search to begin at 6:00 a.m., the officers executed the search in the early morning hours, well before 6 a.m." (Mot. to Suppress at 3.) He offers nothing else. Kartan's motion is fatally unsupported, and the Court should deny it.

Additionally, the Court should not hold an evidentiary hearing because Kartan did not request one, and there are no significant disputed factual issues to resolve through a hearing. First, Kartan failed to comply with Local Rule 430.1(h), which requires that motions "contain a statement whether an evidentiary hearing is requested." Kartan did not request an evidentiary hearing.

Second, regardless of the Local Rule, there is no significant disputed factual issue to resolve through a hearing where Kartan's motion is premised solely on his counsel's unsupported argument. The decision whether to hold an evidentiary hearing "rests in the reasoned discretion of the district court." United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986) (per curiam). "A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a 'significant disputed factual issue' exists such that a hearing is required." United States v. Howell, 231 F.3d 615, 621 (9th Cir. 2000) (quoting United States v. Harris, 914 F.2d 927, 933 (7th Cir. 1990)). "An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." Id. at 620. An evidentiary hearing "is not required on a motion to suppress if the grounds for suppression consist solely of conclusory allegations of illegality." United States v. Ramirez-Garcia, 269 F.3d 945, 947 (9th Cir. 2001). Case law supports that a court need not hold an evidentiary hearing where—as here—the motion is premised on the unsubstantiated argument of counsel in the face of a police report. See, e.g., United States v. Mejia, 953 F.2d 461, 466 (9th Cir. 1992) (affirming denial of evidentiary hearing where district court relied on police report to determine propriety of consent search where no evidence was presented indicating inappropriate behavior by officers); Harris, 914 F.2d 933 (holding that defendant's unsupported allegation that he did not receive proper Miranda warnings was "insufficient to warrant a hearing," where defendant articulated no evidence of a factual dispute); United States v. Carrion, 463 F.2d 704, 706 (9th Cir. 1972) (holding, in context of determining co-conspirator's standing to challenge search, that evidentiary hearing was not required where neither motion to suppress nor supporting affidavit

alleged either ownership or possession of the matter seized); see also Ramirez-Garcia, 269 F.3d at 947 (affirming denial of evidentiary hearing on motion to suppress warrantless seizure where defendant's affidavit revealed no contested issues of fact"); Coleman v. McCormick, 874 F.2d 1280, 1284-85 (9th Cir. 1989) (holding, habeas matter, that "conclusory allegations do not provide a sufficient basis to obtain a hearing in federal court," where counsel, in unsworn argument, challenged jury composition). Kartan offers one sentence of unsupported and non-specific argument against a search warrant return and investigative report.  The Court should not hold an evidentiary hearing if Kartan requests one.

Even if Kartan could show that the search warrant was executed prior to 6:00 a.m., suppression of evidence would not be the proper remedy.  The Supreme Court has stated that "[s]uppression of evidence . . . has always been our last resort, not our first impulse," as the exclusionary rule generates "substantial societal costs."  Hudson v. Michigan, 547 U.S. 586, 591 (2006).  In Hudson, decided after the out-of-Circuit decisions cited by Kartan, the Court revisited the exclusionary rule in relation to the manner of execution of a valid search warrant and, in the case of a conceded violation of the "knock-and-announce" rule, held that suppression was not a proper remedy.  See id. at 592-94.  It explained:

> [E]xclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining evidence.  Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression.  In this case, of course, the constitutional violation of an illegal *manner* of entry was not a but-for cause of obtaining the evidence.  Whether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house.  But even if the illegal entry here could be characterized as a but-for cause of discovering what was inside, we have "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police.'"

Id. at 592 (citations omitted, emphasis in original).  Concluding that the interests served by the rule would not be served by suppression, it held the exclusionary rule inapplicable.  Id. at 594.  Indeed, sister Circuit Courts have held that execution of a "daytime" warrant outside of the prescribed hours did not warrant exclusion of evidence.  See United States v. Williams, No. 16-16444, 2017 WL 4160846, at *4 (11th Cir. Sept. 20, 2017); United States v. Davis, 313 F. App'x 672, 674 (4th Cir. 2009) (unpub.).  Similar to Hudson, in other contexts the Ninth Circuit Court of Appeals has held that suppression is not the proper remedy for violations related to the manner of execution of a search warrant.  See, e.g.,

United States v. Butts, 357 F. App'x 850, 851 (9th Cir. 2009) (unpub.) (holding execution of search warrant one day after it expired did not warrant suppression); United States v. Ankeny, 502 F.3d 829, 835-38 (9th Cir. 2007) (holding suppression was not remedy even assuming knock-and-announce violation and unreasonably destructive execution).  Even assuming a violation here, exclusion is not a proper remedy.

## III.   KARTAN'S UNSUPPORTED MOTION TO DISMISS FAILS BECAUSE THE CONTACTS WERE NOT ON THE SUBJECT OF THE REPRESENTATION AND THERE IS NO PREJUDICE.

The Court should deny Kartan's motion to dismiss for several reasons.  First, as with his suppression motion, Kartan's motion to dismiss is premised on unsworn and unsupported allegations of his attorney that do not suggest that SA Beeson questioned Kartan on the subject of the representation or pending charges, or received any such information.  Instead, the contacts here consisted of the agent: (1) knocking on Kartan's door in an effort to interview a subject, Aruna Kartan, and Kartan answering the door; and (2) attempting to identify or rule out a potential new victim of human trafficking.  Second, the motion also fails because Kartan failed to show that he suffered actual prejudice warranting dismissal.

### A.   Special Agent Beeson had contacts with Kartan where the investigation and charges were not discussed or inquired of.

Briefly, the indictment alleges that the defendants engaged in forced labor with respect to female domestic workers they hired to work in their house.  On September 9, 2016, a search warrant was executed at the defendants' house.  (Exhibits 2-3.)  On September 15, 2017, Kartan's counsel sent a letter to the U.S. Attorney's Office indicating he represented Kartan.  (Exhibit 4.)

On September 27, 2016, at approximately 2:40 p.m., two agents including SA Beeson went to the defendants' house to try to interview Kartan's mother, Aruna Kartan.  (Exhibit 5 at 2)  Aruna Kartan is relevant to the investigation, in part, because she was listed as a point of contact on a visa application for one of the alleged victims who traveled to the United States from India and ultimately reported abuse at the defendants' hands to law enforcement.  (See Exhibits 6-7.)  According to a Report of Investigation, in trying to interview Aruna Kartan, SA Beeson knocked on the door, and nobody answered.  (Exhibit 5 at 2.)  He then rang the doorbell, and Kartan eventually opened the door.  (Id.)  SA

1   Beeson asked Kartan if his mother was home, and Kartan hesitated and then responded that she was not.

2   (Id.)  When SA Beeson asked when she would be home, Kartan told SA Beeson that SA Beeson needed

3   to speak to his attorney.  (Id.)  SA Beeson explained that he was trying to determine when Aruna Kartan

4   would be home so he would not need to keep coming back, and Kartan again said that SA Beeson

5   needed to speak to Kartan's attorney.  (Id.)  The agents left at approximately 2:45 p.m.  (Id.)  Later on

6   September 27th, Kartan's attorney sent a letter (the same one appended to the motion) to the U.S.

7   Attorney's Office regarding the contact.  (Exhibit 8.)  Consistent with the Report of Investigation, on

8   September 29, 2016, an attorney contacted the U.S. Attorney's Office by letter to advise that he

9   represented Aruna Kartan and had been advised that "two days ago, a Homeland Security agent

10   attempted to contact Mrs. Kartan."  (Exhibit 9.)

11         After their arrests on the indictment, the defendants were released with special conditions.  Each

12   defendant has a special condition related to the hiring of domestic help, and Kartan's provides:  "The

13   defendant shall not directly or indirectly recruit, solicit, hire, employ, or otherwise seek the paid or

14   volunteer labor or services of another person who is not a relative by blood, for the purpose of providing

15   domestic labor or services of any kind (e.g., housework, cleaning, cooking) or in-home child care

16   services of any kind (e.g., daycare, nanny services)."  (Exhibit 9; accord Dkts. 7, 20.)

17         On March 28, 2017, SA Beeson and another agent were interviewing the defendants' neighbors,

18   and a previously-interviewed neighbor told the agents that about a week prior he saw a tall, thin, older

19   Indian woman wearing traditional Indian clothing in the defendants' backyard.  (Exhibit 10 at 2.)  The

20   neighbor saw the woman through the fence and could not describe her in more detail or confirm whether

21   the woman was Kartan's mother, who he had previously seen around the time of the search warrant

22   execution.  (See id.)  Based on these facts, SA Beeson called the Assistant U.S. Attorney ("AUSA") at

23   approximately 12:30 p.m. and stated he believed the agents needed to ensure that the unidentified female

24   was not another victim.  (Id. at 2-3.)  Over the course of three hours, the AUSA repeatedly attempted to

25   contact the Pretrial Services Office to see if the office would perform a home check, and during that

26   time agents set up fixed surveillance on the house; eventually, the Pretrial Services Office declined to do

27   the home check.  (Id. at 3.)

28         Later, while SA Beeson was on the phone with the AUSA, SA Beeson observed the garage door

1    open and a van pull out, containing an unidentified Indian female in the passenger seat and a child in the

2    rear.  (Id.)  As Kartan drove past SA Beeson, SA Beeson hung up the phone and decided to follow the

3    van, also calling the Stockton Police Department ("PD") dispatch for assistance.  (Id. at 3-4.)  As SA

4    Beeson followed Kartan, Kartan suddenly exited the highway from the number 2 lane, then turned and

5    then appeared to get back on the highway; SA Beeson believed Kartan was driving in such a manner

6    because he realized SA Beeson was following him.  (Id. at 4.)  SA Beeson activated his police lights to

7    effect a traffic stop, but Kartan continued driving.  (Id.)  Eventually, a marked Stockton PD unit

8    approached a high rate of speed and effectuated a traffic stop.  (Id.)

9            Once stopped, a Stockton PD officer made contact with Kartan.  (Id.)  SA Beeson walked up to

10   that officer to quickly explain the general nature of the case and that he wanted to identify the female

11   passenger.  (Id. at 4-5.)  As SA Beeson was explaining the situation to the officer, Kartan called his

12   lawyer, Mr. Reichel, and handed the phone to SA Beeson.  (Id. at 5.)  SA Beeson explained to Mr.

13   Reichel that he had received information that an unidentified Indian female was reportedly at the

14   residence and agents were simply trying to identify her.  (Id.)  After SA Beeson hung up the phone, he

15   asked for and obtained identification from the female passenger, who produced an Illinois license with

16   the name Aruna Kartan.  (Id.)  He then went back around to the driver's side of the vehicle, where

17   Kartan was interacting with the Stockton PD officer.  (Id.)  The Report of Investigation further states:

18           KARTAN was on his cell phone dialing a number, completely ignoring

19   the SPD Officer.  Once KARTAN finished dialing the number, he told the
     officer to talk to his attorney.  The officer told KARTAN he didn't want to

20   talk to KARTAN's attorney.  The officer told . . . KARTAN could speak
     for himself.  KARTAN did not respond, he simply held the phone out and

21   refused to speak or listen to what the officer was telling him.  The officer
     continued to talk to KARTAN with Mark Reichel on the other line.  I told

22   the SPD Officer that we did not need anything additional from KARTAN
     because we had identified the passenger in the vehicle and were simply

23   trying to determine if there was a potential human trafficking victim at the
     residence. . . .  Neither KARTAN nor his mom, Aruna KARTAN, were

24   removed from the vehicle, nor asked any questions about their ongoing
     criminal investigation.

25   (Id.)

26        **B.**    **Rule 2-100 prohibits contact about the subject of the representation, and the**

27                **defendant must show actual prejudice.**

28   Rule 2-100(A) of the California Rules of Professional Conduct provides that "[w]hile

OPP'N TO MOT. TO SUPPRESS & MOT. TO DISMISS,
UNITED STATES V. KARTAN, 2:16-CR-0217 MCE

representing a client, a member shall not communicate directly or indirectly *about the subject of the representation* with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer" (emphasis added).  It does not prohibit "[c]ommunications otherwise authorized by law."[1]  Cal. R. Prof. Conduct 2-100(C)(3).  Rule 2-100 applies to federal prosecutors pursuant to 28 U.S.C. § 530B.[2]  United States v. Carona, 660 F.3d 360, 363 (9th Cir. 2011).  Rule 2-100 tracks Rule 4.2 of the Model Rules of Professional Conduct, which provides that "[i]n representing a client, a lawyer shall not communicate *about the subject of the representation* with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order" (emphasis added).

Although not a categorical rule, the "no contact" rule in Rule 2-100 generally does not apply to pre-indictment, non-custodial conversations with a suspect.  See, e.g., United States v. Talao, 222 F.3d 1138-39 (9th Cir. 2000); United States v. Powe, 9 F.3d 68, 69 (9th Cir. 1993) (per curiam).  The Ninth Circuit Court of Appeals has stated that "[t]o determine whether 'pre-indictment, non-custodial communications by federal prosecutors and investigators with represented parties' violated Rule 2-100, we have adopted a 'case-by-case adjudication' approach rather than a bright line rule."  Carona, 660 F.3d at 364 (citing Talao, 222 F.3d at 1138-39).

Although the Ninth Circuit Court of Appeals has held that Rule 2-100 can potentially apply pre-indictment, it has held that "[b]eginning at the latest upon the moment of indictment, a prosecuting attorney has a duty under ethical rules like Rule 2-100 to refrain from communicating with represented defendants."  United States v. Lopez, 4 F.3d 1455, 1461 (9th Cir. 1993).  It has explained that the

---

[1] The notes to Rule 2-100 provide, in part:  "Rule 2-100 is intended to control communications between a member and persons the member knows to be represented by counsel unless a statutory scheme or case law will override the rule.  There are a number of express statutory schemes which authorize communications between a member and person who would otherwise be subject to this rule.  These statutes protect a variety of other rights such as the right of employees to organize and to engage in collective bargaining, employee health and safety, or equal employment opportunity.  Other applicable law also includes the authority of government prosecutors and investigators to conduct criminal investigations, as limited by the relevant decisional law."  Cal. R. Prof. Conduct 2-100, Discussion ¶ 1.

[2] Pursuant to 28 U.S.C. § 530B, "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."

1    "prosecutor's ethical duty to refrain from contacting represented defendants entifies upon indictment for

2    the same reasons that the Sixth Amendment right to counsel attaches." <u>Id.</u> at 1460.  In discussing Rule

3    2-100 and the Sixth Amendment, it has stated that the indictment "focus[es] 'the subject of the

4    representation.'" <u>Id.</u> (citing <u>Maine v. Moulton</u>, 474 U.S. 159, 176 (1985)).  Under Sixth Amendment

5    case law, the right to counsel is "offense-specific" and attaches "only on the offenses for which [the

6    defendant] has been indicted, and any other offense that constituted the 'same offense' under the

7    <u>Blockburger</u> test." <u>United States v. Danielson</u>, 325 F.3d 1054, 1066 (9th Cir. 2003) (citing <u>McNeil v.</u>

8    <u>Wisconsin</u>, 501 U.S. 171, 175 (1991), and <u>Texas v. Cobb</u>, 532 U.S. 162, 167-73 (2001)); <u>accord</u> <u>People</u>

9    <u>v. Webb</u>, 6 Cal. 4th 494, 527, 862 P.2d 779, 800 (1993).  Similarly, the California Supreme Court—the

10   dispositive interpreter of Rule 2-100—has held that Rule 2-100 does not apply to law enforcement

11   contacts with a represented party on a matter other than the charged offense.  <u>See</u> <u>People v. Gonzales</u>, 52

12   Cal. 4th 254, 284-85, 256 P.3d 543, 569 (2011); <u>People v. Maury</u>, 30 Cal. 4th 342, 408-09, 68 P.3d 1,

13   49-50 (2003).

14          The court may remedy a violation of Rule 2-100 under its "supervisory powers." <u>Lopez</u>, 4 F.3d

15   at 1463.  Dismissal of an indictment is an "extreme remedy" that can be impose only when the

16   government's conduct "caused substantial prejudice to the defendant and [was] flagrant in its disregard

17   for the limits of appropriate professional conduct." <u>Id.</u> at 1464 ("[E]ven assuming that Lyons did act

18   unethically, we question the prudence of remedying that misconduct through dismissal of a valid

19   indictment.").  To justify dismissal, there "must be some prejudice to the accused by virtue of the

20   alleged acts of misconduct," and "the idea of prejudice entails that the government's conduct had at least

21   some impact on the verdict and thus redounded to [the defendant's] prejudice." <u>Id.</u> (citation and

22   quotation marks omitted, modification in original).  And for a court to invoke its supervisory powers to

23   dismiss an indictment for prosecutorial misconduct, the defendant must be "actually prejudiced." <u>See,</u>

24   <u>e.g.</u>, <u>United States v. Larrazolo</u>, 869 F.2d 1354, 1358 (9th Cir. 1989) (citing <u>Bank of Nova Scotia v.</u>

25   <u>United States</u>, 487 U.S. 250, 254-55 (1988)), <u>overruled on other grounds in</u> <u>Midland Asphalt Corp. v.</u>

26   <u>United States</u>, 489 U.S. 794 (1989); <u>accord</u> <u>Lopez</u>, 4 F.3d at 1464 (citing <u>Larrazolo</u>, 869 F.2d at 1358).

27   A defendant cannot premise actual prejudice on a general allegation of strain on the attorney-client

28   relationship.  <u>See</u> <u>Lopez</u>, 4 F.3d at 1464 (citing <u>United States v. Owens</u>, 580 F.2d 365, 368 (9th Cir.

1978)).

### C.  <u>SA Beeson's contacts were not about the subject of the representation.</u>

Turning to the contacts in question, neither set of contacts was on the subject of the representation.  Therefore, Kartan's motion substantively fails.[3]

First, with respect to SA Beeson's contact with Kartan on September 27, 2016, SA Beeson's contacts consisted of asking Kartan if his mother was home, and when Kartan said she was not home, when she would be back.  This contact was not about the subject of the representation.  Examining Kartan's characterization of the interaction, at most he vaguely says, in total, that SA Beeson "kept asking questions of and trying to talk to the defendants."  (Mot. to Dismiss at 2.)  SA Beeson does not deny trying to talk to Kartan about whether Aruna Kartan was at the house, but that contact does not run afoul of Rule 2-100.  Kartan does not allege or substantiate that SA Beeson tried to ask him about the pending investigation.  Accordingly, Kartan's motion fails as to the September 27th contact.

Second, the Court should deny Kartan's motion because SA Beeson's contact with Kartan on March 28, 2017, was not "about the subject of the representation" and was "authorized by law."  His contact, which occurred in the context of rapidly unfolding events and was intended solely to identify an unknown female in Kartan's car, concerned investigation of new potential criminal conduct and the potential violation of conditions of pretrial release that the Pretrial Services Office would not clear up.

Again, Rule 2-100(A) prohibits communications about the subject of the representation, and does not prohibit "[c]ommunications otherwise authorized by law."  Cal. R. Prof. Conduct 2-100(A), (C)(3).  The notes to Rule 2-100 provide, in part, that the rule "is intended to control communications between a member and persons the member knows to be represented by counsel unless a statutory scheme or case law will override the rule," and that "[o]ther applicable law also includes the authority of government prosecutors and investigators to conduct criminal investigations, as limited by the relevant decisional law."  Cal. R. Prof. Conduct 2-100, Discussion ¶ 1.

As to decisional law, the California Supreme Court has held that, like the Sixth Amendment,

---

[3] As with his motion to suppress, Kartan did not request an evidentiary hearing, and such a hearing, even if requested, would be unnecessary given the absence of any support for the motion other than the unsworn statements of counsel.

Rule 2-100 is offense-specific and does not apply to communications not relating to the pending

charges.  See Gonzales, 52 Cal. 4th at 284-85, 256 P.3d at 569; Maury, 30 Cal. 4th at 408-09, 68 P.3d at

49-50.  In Maury, a prosecutor and detective interviewed the defendant about an uncharged murder

outside the presence of the defendant's counsel, who represented the defendant on an unrelated charged

offense.  On appeal, the defendant argued that the prosecutor violated the predecessor to Rule 2-100,

Rule 7-103, by interviewing the defendant without his counsel's consent.  Maury, 30 Cal. 4th at 408, 68

P.3d at 49-50.  The Supreme Court rejected that argument, focusing on the offense-specific nature of the

ethics rule, interpreting it consistent with the Sixth Amendment:

> [D]efendant contends that the district attorney engaged in "unethical conduct" by violating then rule 7-103 of the California Rules of Professional Conduct, which provided, in pertinent part, that "A member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel *upon a subject of controversy* without the express consent of such counsel. . . . " (Italics added.)  However, defendant was represented by counsel only on an unrelated charge and not on the Weeden murder.  (See People v. Webb (1993) 6 Cal.4th 494, 527, 24 Cal.Rptr.2d 779, 862 P.2d 779 [Sixth Amendment right to counsel is "offense-specific," i.e., it attaches only to those offenses for which adversary judicial criminal proceedings have begun].)  He fails to establish the applicability of the rule to the district attorney's conduct . . . .

Id. (emphasis and second modification in original).  Similarly, in Gonzales, the defendant was serving

time in jail for a drug offense, and a fellow inmate wore a wire and recorded his conversation with the

defendant relating to multiple uncharged murders.  52 Cal. 4th at 283, 256 P.3d at 568.  On appeal, the

California Supreme Court first rejected the defendant's Sixth Amendment argument on the basis that the

right to counsel is offense-specific.  Id. at 284, 256 P.3d at 569.  Citing Maury, it then rejected the

defendant's argument that the government violated Rule 2-100:

> Alternatively, Gonzales argues that rule 2-100 of the California Rules of Professional Conduct prohibits a lawyer from communicating with another party in a case without the consent of the other party's lawyer, and the prosecutor violated this rule by having his agent Berber communicate with Gonzales.  We have, however, previously rejected the argument that rule 2-100 applies to this situation.

Id. at 284-85, 256 P.3d at 569 (citing Maury, 30 Cal. 4th at 408-09).

Courts analyzing Model Rule of Professional Conduct 4.2 and related state "no contact" rules

similar to Rule 2-100 have also held that contacts on matters beyond charged offenses are not about the

1  "subject of the representation."  In United States v. Ford, 176 F.3d 376, 381-82 (6th Cir. 1999), the Sixth

2  Circuit Court of Appeals found no violation of Kentucky's no contact rule where the government placed

3  an informant in the cell of a defendant charged with money laundering and gambling offenses, for the

4  purpose of investigating uncharged jury tampering.  It explained:

> Rule 4.2 specifically states that "a lawyer shall not communicate about the
> subject of the representation . . ."  Since prosecutors were investigating an
> offense other than the offense for which Defendant was indicted, the
> contact does not pertain to the "subject matter of the representation" as
> Rule 4.2 states.  Any other deviation of this interpretation of Rule 4.2
> would place prosecutors at risk of committing an ethical violation for
> pursuing actions that they are required to pursue in the interest of public
> safety.

10  Id.  Similarly, in United States v. Mullins, 613 F.3d 1273, 1289 (10th Cir. 2010), the Tenth Circuit Court

11  of Appeals held that the government did not violate the no contact rule in Colorado Rule of Professional

12  Conduct 4.2 when it dismissed an initial indictment against the defendant, used an informant to contact

13  the defendant, and thereafter re-indicted the defendant on the dismissed charges and new charges.  In

14  United States v. Escobar, 842 F. Supp. 1519, 1526-27 (E.D.N.Y. 1994), the court held that the

15  government did not violate the no contact rule in then-numbered Code of Professional Responsibility

16  DR7-104(A)(1) when it investigated "new crimes and allegations," including death threats, by placing

17  an informant in the cell of a defendant charged with RICO and other unrelated violations.  See also

18  United States v. Basciano, 763 F. Supp. 2d 303, 329-30 (E.D.N.Y. 2011) (holding no violation of New

19  York's former no contact rule, DR 7-104(A)(1), where defendant was contacted via government

20  informant regarding racketeering crimes after being indicted on similar racketeering crimes).

21        Here, SA Beeson communicated with Kartan regarding potentially new, uncharged criminal

22  conduct, and thus Rule 2-100 does not apply because the communication was not about the subject of

23  the representation.  Furthermore, the contact here was of a unique and limited quality.  When SA Beeson

24  approached the van, Kartan got his attorney on the phone, and SA Beeson explained to Mr. Reichel that

25  he had received information that an unidentified Indian female was reportedly at the residence and was

26  simply trying to identify her.  He then proceeded to identify Aruna Kartan as the passenger, and then

27  terminated the encounter.  Again, Kartan offers no concrete allegation that SA Beeson even asked him

28  about the subject of the representation.  SA Beeson had a duty to determine that the Indian female—who

matched the profile of the defendants' other victims—was not yet another victim.  And SA Beeson only made contact:  after the Pretrial Services Office declined the government's request that it clear up the issue, after Kartan left the house with the still unidentified female in his van, and after Kartan began driving evasively.  SA Beeson's contact did not violate Rule 2-100.

### D.   Even if the court finds misconduct, the "extreme" remedy of dismissal is unwarranted because Kartan has shown no resulting actual substantial prejudice.

Even if the Court were to find a violation of Rule 2-100—and the government does not concede as much—Kartan has made no showing of substantial, actual prejudice warranting the dismissal.  To be clear, the government asks the Court to make a finding that there was no violation.

To justify the "extreme remedy" of dismissal, "the government's conduct must have caused substantial prejudice to the defendant and been flagrant in its disregard for the limits of appropriate professional conduct."  Lopez, 4 F.3d at 1464.  The defendant must suffer substantial prejudice "by virtue of the alleged acts of misconduct," and the concept of "prejudice entails that the government's conduct had at least some impact on the verdict and thus redounded to [the defendant's] prejudice."  Id. (citations and internal marks omitted).  For a court to dismiss an indictment for prosecutorial misconduct, the defendant must be "actually prejudiced."  Id.; see also Larrazolo, 869 at 1358.

Here, Kartan has not, and cannot, demonstrate any prejudice resulting from SA Beeson's conduct on September 27, 2016, or March 28, 2017.  His motion does not mention the concept of prejudice.

## IV.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant Satish Kartan's untimely filed and substantively meritless and baseless motions.

Dated:  October 19, 2017

PHILLIP A. TALBERT
United States Attorney

By:  /s/ NIRAV K. DESAI
NIRAV K. DESAI
Assistant United States Attorney