```
             IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF CALIFORNIA
           BEFORE THE HONORABLE MORRISON C. ENGLAND

UNITED STATES OF AMERICA,

             Plaintiff,
vs.                              Sacramento, California
                                 No. 2:16-CR-00217
SATISH KARTAN, SHARMISTHA        Wednesday, February 20, 2019
BARAI,                           9:07 a.m.

             Defendants.
_____/

                           --oOo--
               REPORTER'S EXCERPT OF JURY TRIAL
              OPENING STATEMENT BY THE GOVERNMENT
                           --oOo--
APPEARANCES:

For the Government:       U.S. ATTORNEY'S OFFICE
                          JASON HITT
                          KATHERINE T. LYDON
                          Assistant U.S. Attorneys
                          501 I Street, Suite 10-100
                          Sacramento, CA  95814

For the Defendant         REICHEL & PLESSER
Satish Kartan:            MARK J. REICHEL
                          Attorney at Law
                          455 Capitol Mall, Suite 802
                          Sacramento, CA  95814

For the Defendant         OFFICE OF THE FEDERAL DEFENDER
Sharmistha Barai:         DOUGLAS J. BEEVERS
                          JEROME PRICE
                          CHRISTINA SINHA
                          Assistant Federal Defenders
                          801 I Street, 3rd Floor
                          Sacramento, CA  95814

Official Reporter:        KACY PARKER BARAJAS
                          CSR No. 10915, RMR, CRR, CRC
                          501 I Street
                          Sacramento, CA  95814
                          kbarajas.csr@gmail.com
```

*Proceedings recorded by mechanical stenography.  Transcript produced by computer-aided transcription.*

1           (Begin excerpt.)

2                OPENING STATEMENT BY THE GOVERNMENT

3           MR. HITT:  Thank you.  Good morning, ladies and

4   gentlemen.  This case is about a two-year effort, an ongoing

5   conspiracy by those two defendants, Mr. Satish Kartan and

6   Ms. Sharmistha Barai, to obtain labor from overseas, keep those

7   women in their home conducting forced labor under grueling

8   conditions.

9           The evidence in this case will show that some of these

10  women were subjected to 18-hour workdays after being promised

11  simple baby child care as a live-in nanny.  You'll hear about

12  emotional and physical abuse towards these victims, and you'll

13  hear about the various tools within the conspiracy that they

14  used to make these women feel they had no choice but to comply

15  with the defendants' orders.

16          What this case will show you is that both Mr. Kartan

17  and Ms. Barai had a relentless desire to have people serve them

18  by any means necessary.  The scene for this trial will

19  primarily revolve around 6541 Brook Hollow Circle.  On the

20  outside, the home appears idyllic.  It's a gated community to

21  keep unwanted strangers out.  The trees are mature.  The lawns

22  are manicured.  But the inside of that home was the exact

23  opposite.  It was the scene of cruelty.  It was the scene of

24  helplessness and desperation by women who felt they had no

25  choice but to either escape or comply with orders.

1          The overall conspiracy in count 1, you will be
2  permitted to consider the evidence from all of the victims that
3  you hear about or that you hear from.  In the conspiracy, there
4  were multiple victims, and over the two years you'll hear about
5  various witnesses who were victims or witnesses who came into
6  contact with victims during the two-year effort.
7          I want to talk to you a little bit about the tools of
8  conspiracy that you'll hear about in this case.  You'll hear
9  that there were basic patterns that were followed in order,
10 first, to lure the women from overseas to the home at Brook
11 Hollow.  Perhaps the most important tool used were
12 advertisements both online and in newspapers.  These
13 advertisements, as you'll see in that slide, promised up to
14 $2,000 a month.  The terms seem fairly favorable, basically the
15 California dream.  Be a live-in nanny, care for a child.  But
16 the reality is when the women responded to the ad and made the
17 grueling flights from India or Nepal or elsewhere, the
18 advertised job was nothing like the lived experience.  As I
19 mentioned, it's grueling physical labor.  It goes well beyond
20 simple baby care.  Cleaning dishes, cleaning toilets, mopping
21 floors, no breaks, no rest.
22         The other interesting thing about these online ads is
23 where they were placed.  As I mentioned, India and Nepal were
24 two of the primary places you'll see advertisements seeking
25 help.  The reason that's significant is that those women, some

1  who you'll hear from, were very vulnerable.  They were
2  vulnerable because they arrived at the home of the defendants
3  with very little to no money.  Usually their cell phones were
4  barely working or not working.  They were cut off and isolated
5  from their families back home, and they don't speak the
6  language, nor are they familiar with how American laws are
7  designed to protect people.  That was a tool that was very
8  important to the defendants, isolation and being cut off from
9  their homelands.  And those ads were the lure that brought the
10 victims to the defendants' home in Stockton.
11          Another important tool was the gate.  The gate at this
12 community served the purpose of keeping the victims in.  And at
13 least in one instance you'll hear from a victim named Ms. Gouni
14 where the gate, the existence of the secured metal entrance
15 that required a code, became an important tool in threatening
16 Ms. Gouni and suggesting to her, since you don't know the code,
17 how can your loved ones ever come and recover you.  They won't
18 know how to get in.  So the gate kept loved ones from getting
19 in, and it kept the victims from feeling that they could get
20 out.  Again, remember the nature of the victims in this case
21 wouldn't know how to operate these codes.  And if you're not
22 given the codes, you can't get in or out.  So that was another
23 tool that you'll learn about in this conspiracy.
24          Cell phones were also used, and they sort of had two
25 purposes that you'll learn about in this case.  The first

1  purpose was to essentially restrict or cut off access from the
2  victims communicating outside of 6541 Brook Hollow.  Without
3  the ability to communicate at home, you'll hear from some of
4  the victims, how desperate they begin to feel because they
5  couldn't speak to their husbands, their children.  And when
6  cell phones were permitted to be used, in the case of
7  Ms. Gouni, for example, you'll hear how Mr. Kartan would
8  immediately or very quickly restrict the amount of time and the
9  times when the phone could be used.
10          The second way that the phones were used, and you see
11 this in this slide, was for the defendants, Mr. Kartan and
12 Ms. Barai, to communicate with each other about the real-time
13 abuse they were committing.  You'll see in this text thread
14 that will be introduced at trial, Ms. Barai is carefully
15 monitoring the behavior of one of the victims who is in their
16 home, persistently asking Mr. Kartan, has she done this, has
17 she done that.  So the cell phones are another important tool.
18          And the final tool you'll hear is simply the behavior
19 these defendants exhibited with a very important purpose to the
20 behavior.  The shouting, the insults, the constant criticism
21 and harassment was designed to control these women.  Up early,
22 5:30 or 6:00 in the morning, to bed late, 11:00 p.m. or
23 midnight.  No job was ever done correctly.  No job was ever
24 finished.  There was an endless source of tasks and
25 responsibilities.  You'll hear how in the instance of Ms. Gouni

1  she very -- her body began to break down because she could not
2  eat appropriate food to keep her strength.  While she prepared
3  meals that were then enjoyed by the defendants in front of her,
4  she continued to toil away surviving on some snacks that she
5  brought from India.  She was never invited to share the food
6  that they had.  The bountiful food that was in their
7  refrigerators and pantries was not offered to the victims.
8  That was for Mr. Kartan and Ms. Barai and their young child,
9  not for the victims.
10          Before I move to the next section, I want to make
11  clear what you'll learn about is a climate of fear in this home
12  with a very specific purpose.  A climate of fear caused by each
13  of those tools designed to keep these women in compliance or at
14  least in their minds believing they had no other choice.
15          Now the evidence in this case will come in from kind
16  of two inner overlapping layers, and I'll tell you up front, as
17  the judge mentioned yesterday in his preliminary instructions,
18  we have witnesses from a lot of different places who have a lot
19  of different schedules.  So some of the evidence will come in a
20  little bit out of order, or you may hear from a witness who has
21  interaction with someone early in the conspiracy and later in
22  the conspiracy.  At the end of the case, my colleague Ms. Lydon
23  will have an opportunity to bring that together for you, but I
24  just want to flag it so that, as these witnesses provide their
25  testimony and as the exhibits are received in evidence, don't

1  be too confused about which time period.  We'll do our best to
2  flag where this comes within the two-year conspiracy, but some
3  of the schedules are why we have to work around calling people
4  out of order.  I wish I could do it in a nice, clean,
5  chronological order, but that's just not possible with some of
6  the obstacles we have in this case.
7        But here are the two overlapping perspectives you'll
8  hear from.  You'll hear from at least two victims, two women
9  who were inside 6541 Brook Hollow.  You'll also hear from an
10 outside perspective, and these kind of fall into two pots of
11 evidence when you hear from them in this courtroom.  The first
12 pot are neighbors.  You'll hear about the next door neighbors,
13 the across-the-street neighbor, and the other pot are law
14 enforcement witnesses.  And I'll talk about each of those
15 groups in a little bit.
16       But let's start with that first perspective, the
17 inside perspective.  I've mentioned Mr. Gouni a few times, and
18 you'll hear from her in this trial.  In late 2015, Ms. Gouni
19 decided that an ad in an Indian newspaper seemed to be an
20 attractive option.  She had a son that lived in the Bay Area,
21 and she thought I can visit him, and I could also make a little
22 money.  You'll see emails in Mr. Kartan's Yahoo! account where
23 he's carefully communicating with loved ones of Ms. Gouni
24 arranging her flight, making sure her flight itinerary is in
25 order.  And the ad that he put out there in the paper and the

1 representations you'll hear about that he made to Ms. Gouni
2 were you'll be taking care of our small child.  You'll be
3 earning up to $2,000 a month.
4         But when she made that grueling flight from India to
5 the United States and finally made it to 6541 Brook Hollow,
6 you'll hear about her experience, and it was not simple baby
7 care.  She only made it about four days before she needed to
8 escape.  You'll hear how her body broke down from the
9 relentless work schedule, the endless chores, the verbal abuse,
10 the isolation.  She had no money to her name.  Her cell phone
11 was carefully restricted and not working very well.  She didn't
12 speak the language, and she has no understanding of
13 United States laws.
14         You'll also hear that as the reaction to her need to
15 leave grows, she became very concerned about what her leaving
16 this home might do to her family.  You'll hear that her son was
17 in the United States and a daughter, and you'll hear her
18 concern about what might happen to them if she got in trouble
19 because of these defendants.  That's where her mind was, as
20 she'll describe.  And you'll hear that on or about the fourth
21 day within that home she had had enough, and she saw an
22 opportunity.  You'll hear how she escaped from the house and
23 with the help of some kind neighbors was finally able to make
24 communication with her family and plead for help.  You'll hear
25 about the emotional release she had when she finally heard her

1  daughter's voice on the other end of that line.  Come save me.

2        And when she returned to 6541 Brook Hollow where these

3  defendants resided, you'll hear about their angry reaction when

4  she gathered her belongings and announced I'm leaving.  You'll

5  hear how it included threats to call the police on her, and

6  you'll hear what effect that had on her mind and the fear for

7  herself, but more importantly, for her children.  You'll hear

8  how she was finally able to reach safety with the help of her

9  son picking her up from the gated community, but not before

10 Mr. Kartan had some choice words about what might happen if

11 that son couldn't get in.

12       So that's one inside perspective, one of the victims

13 you'll hear from.  Another victim you'll hear from is

14 Ms. Thamma.  Like Ms. Gouni, Ms. Thamma was living in India and

15 responded to an ad.  She thought this would be a good

16 opportunity for her to work in the United States, and the ad

17 that she was responding to is very similar to the other ads

18 you'll see, earn up to $2,000, et cetera.

19       And you'll see that in July of 2016, so now we're

20 almost a year after Ms. Gouni, in July of 2016 you'll see in

21 Mr. Kartan's Yahoo! account again he's carefully monitoring her

22 flight from India into SFO down the road in San Francisco.  And

23 you'll see an important Uber receipt that confirms not only the

24 day she arrived or the evening at 11:00 at night but the Uber

25 ride that he carefully orchestrated for her to take from SFO

1  all the way to Stockton, California to their home.  And he paid
2  $134.65 for that ride to deliver her body to his home.  And
3  you'll see what time she arrived, 1:17 in the morning, early
4  hours of July 19, 2016.  And unlike Ms. Gouni, she survived six
5  weeks in this home.  You'll hear she got it the worst.
6  　　　　　　During that six-week period, you will hear from
7  Ms. Thamma and what she experienced at the defendants' home,
8  physical abuse, mental abuse, isolation.  She had about $500 to
9  her name that she had brought with her.  You'll hear how
10 Mr. Kartan took that from her too.  And you'll hear she doesn't
11 speak the language.  And unlike Ms. Gouni, she didn't have a
12 son that could come and rescue her.  None of her family is in
13 the United States.  Her phone had stopped working when she left
14 India, and you'll hear the threats that were levied at her by
15 Ms. Barai and Mr. Kartan in an effort to keep her obeying their
16 orders.
17 　　　　　　Like Ms. Gouni, Ms. Thamma had to find a way to
18 escape.  You'll hear a very lucky break that she caught on the
19 day that she escaped, August 31, 2016.  You'll hear how she
20 escaped.  And once she got out, once again a neighbor -- a set
21 of neighbors took pity on her and rescued her.  During that
22 time, July 19 to August 31, 2016, Ms. Thamma endured scenes of
23 cruelty and a climate of fear.
24 　　　　　　So I mentioned the second perspective, the outsiders.
25 You're going to hear from the neighbors next door.  And some of

1   the neighbor testimony may be relatively short, but what that
2   testimony will focus on are brief but very memorable and
3   unusual reactions or interactions with women that were coming
4   from 6541.  And these testimony -- the testimony you'll hear
5   from some of these neighbors will be from their perspective of
6   something is not right in that home and who is this woman that
7   needs help.
8           So the first set of neighbors you'll hear from are two
9   sisters, Joann and Valentina Nunez.  Where that arrow is,
10  that's where they live, right next door to the Kartan and Barai
11  compound.  And you'll hear about August 31.  They're the
12  neighbors Ms. Thamma fled to.  You'll hear how he took pity on
13  her, tried to understand through basic English and motions that
14  she used with her hands and through her tears realizing she
15  needs help.  She needs food.  She needs water.  And how they
16  cared for her and ultimately called the Stockton Police
17  Department to get her help.
18          You'll also hear from an across-the-street neighbor,
19  gentleman by the name of Mr. Saifuddin.  He had two
20  interactions during the two-year conspiracy.  You'll hear about
21  in 2015 how Mr. Saifuddin and his family, living across the
22  street from the defendants, came into contact with a woman that
23  he knew as Lakshmi.  He had some unusual interactions with her,
24  and he became concerned, so concerned in fact that you'll hear
25  that his family would leave packets of food outside their door

1  to make sure she was getting at least some food.  And you'll
2  hear that over time eventually he decided they would take her
3  in for a short period of time in order to help her escape the
4  defendants.  And then he had a second interaction, and this
5  will be an interesting intersection of witnesses that you'll
6  get to hear from in this trial.  The second victim that he
7  interacted with will be Ms. Gouni, who I talked about earlier,
8  the kind neighbor that allowed her to finally contact her
9  daughter, that was Mr. Saifuddin, and he witnessed what she was
10 going through.  And he helped her get reconnected with her
11 family.  So those are kind of the neighbor witnesses you'll
12 hear from.
13           You'll also hear from law enforcement officials.  And
14 one of the first ones you'll hear from is this gentleman on the
15 left in this photo, that's Stockton Police Officer Harpreet
16 Shoker.  He had just started on the force, and you'll hear he
17 speaks Hindi.  And he came into contact with a totally
18 different woman than any that I've described in this opening.
19 You'll hear on January 22nd, 2016, relatively new to the shift
20 and relatively new to the force, this woman, a woman named
21 Ramgopal or Ms. Ramgopal, had appeared out of nowhere at the
22 Stockton Police Department needing assistance.  You'll hear how
23 he carefully detailed the details from her passport from India
24 to try and understand and piece together what is going on here
25 and why is she in downtown Stockton at the police station.  And

1  you'll see how those details that Officer Shoker took from her
2  Indian passport match to Mr. Kartan's Yahoo! account and the
3  flight and the travel that he had arranged for Ms. Ramgopal to
4  come to their house from India.  In fact, the very same
5  passport was found in Mr. Kartan's Yahoo! account that
6  Officer Shoker carefully detailed the details from.
7          So you'll see the match that Ms. Ramgopal ends up down
8  at the Stockton Police Department needing assistance and how
9  Mr. Kartan's email was a clue of how she ended up in the
10 United States in the first place.
11         Officer Shoker has an interesting perspective as well
12 because he met a second victim in this case.  It's the woman I
13 talked about a little earlier, Ms. Thamma.  She's the one that
14 escaped to the Nunez's house.  You'll hear about his
15 interaction with Thamma.  And although he speaks Hindi,
16 Ms. Thamma speaks Telugu.  And while there are some common
17 denominators in the languages, they are distinct languages.  So
18 even he had difficulty communicating with her.  But you'll hear
19 about his impressions and his interactions with her that day
20 and ultimately his efforts to make sure she was safe.
21         Officer Shoker and his team, when they responded to
22 the Nunez house to take care of Ms. Thamma, that ultimately led
23 to a search warrant and the close of the conspiracy that you'll
24 learn about in this case.  That interaction on August 31st,
25 2016, shortly thereafter in early September led to a search

1    warrant by federal authorities.
2            And some of those law enforcement witnesses I talked
3    about, that outside perspective, you'll get to hear from the
4    search warrant participants and some of the other
5    investigators.  So before the search warrant, you'll hear from
6    Homeland Security Special Agent Rosaline Avakian.  She'll take
7    you through evidence detailed in Mr. Kartan's Yahoo! account
8    and Ms. Barai's Gmail account including an ad or a request for
9    an ad in which Ms. Barai specifically requests that the ad also
10   be shown in Nepal because those are hard-working people.  That
11   was a finding that Special Agent Avakian and her team found as
12   they conducted research and a search warrant into their Gmail
13   accounts and Yahoo! accounts.
14           You'll also hear from a number of agents that actually
15   executed the search warrant into the compound the defendants
16   controlled on Brook Hollow.  You'll hear from Jaime Cardoza.
17   She collected the physical items of evidence in the house.
18   This will include an alarm clock that you'll hear testimony
19   about from the victims, a tool that was used to make sure they
20   were up on time, and it includes a padlock on the back gate
21   that was recovered.  And you'll hear how that plays into one of
22   the escape plans from one of the victims.
23           You'll also see a notepad that is filled with
24   handwriting of numbers, names, and statuses for potential
25   nannies that was carefully documenting all of the responses

1  received from the ads.

2        And you'll hear from Manny Acala.  He's a technical
3  enforcement officer for Homeland Security.  He'll walk you
4  through the photographs that were taken within the home, and
5  you'll get a sense of the layout of what things were like
6  within that house.

7        And finally, you'll hear from special agent Kirk
8  Blackwelder.  He's a retired forensic expert in computers and
9  cell phones.  He'll talk to you a little bit about what the
10 Cellebrite technology is, and it was a tool he used in this
11 case to extract text messages between Mr. Kartan and Ms. Barai
12 on a cell phone that was recovered during a search warrant.
13 And you'll get to see some of those text messages, and he'll
14 explain how he was able to retrieve those texts.

15       Now at the end of the case, the counts kind of break
16 down into three groups.  The first and the largest that you'll
17 be considering throughout the entire trial is the conspiracy
18 count.  That's count 1.  And what that focuses on is the
19 ongoing plan by these two defendants to have a forced labor
20 operation within their home in Stockton.  It's all the tools
21 that I talked about.  It's all the techniques.  And it's the
22 abuse they put upon their victims.  As I mentioned, you can
23 consider all of the victims for the conspiracy that you'll
24 learn about.  This is a sampling, Ms. Gouni, Mr. Ramgopal,
25 Ms. Thamma.

1        Then there's forced labor counts, and what those focus
2   on are the actual victimization, the women that were subject to
3   the force.  So those will be forced labor counts, different
4   from the conspiracy count.
5        And finally there's a count that focuses just on
6   Mr. Kartan alone, and this is really more of a narrow charge
7   that looks at how he used ads to lie to Thamma, how he
8   misrepresented what the purpose of this job would be, and how
9   the reality was much different.  For example, not getting paid
10  after six weeks and having to escape, that's not what was
11  promised in the ads posted by Mr. Kartan and the promises used
12  to induce Ms. Thamma to travel across the globe.
13       At the end of this case, ladies and gentlemen, we will
14  ask you based on all the evidence presented in this case to
15  hold these defendants responsible and find them guilty on all
16  counts.  Thank you for your time and attention.
17       (End of excerpt.)
18                            --oOo--
19  I certify that the foregoing is a correct transcript from the
20  record of proceedings in the above-entitled matter.
21                            /s/ Kacy Parker Barajas
                              _____
22                            KACY PARKER BARAJAS
                              CSR No. 10915, RMR, CRR, CRC
23
24
25